**Affirmed and Opinion filed October 31, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00414-CV
### NO. 14-19-00415-CV
### NO. 14-19-00416-CV

## IN THE MATTER OF A.J.F., A CHILD

**On Appeal from County Court at Law No. 2**
**Galveston County, Texas**
**Trial Court Cause Nos. 19-JV-0022, 19-JV-0023, and 19-JV-0102**

## O P I N I O N

The State filed three petitions alleging appellant A.J.F., a juvenile, engaged in delinquent conduct. The first petition alleged he committed aggravated robbery of a Galveston restaurant ("the Robbery Case").[1] The second and third petitions concerned appellant's alleged possession of methamphetamine ("the Drug Case")[2] and harassment of a public servant ("the Harassment Case"),[3] respectively

---

[1] Trial court number 19-JV-0022; appeal number 14-19-00414-CV.

[2] Trial court number 19-JV-0023; appeal number 14-19-00415-CV.

[3] Trial court number 19-JV-0102, appeal number 14-19-00416-CV.

(collectively "the Subsequent Cases").

The State later filed a petition in the Robbery Case asking the juvenile court to exercise its discretion to waive its jurisdiction and transfer appellant to district court under section 54.02(a) of the Family Code. The court granted the State's request by order signed May 6, 2019 ("the Discretionary Transfer Order"). Later that day, the State filed petitions in the Subsequent Cases contending the existence of the Discretionary Transfer Order required the court to waive its jurisdiction and transfer appellant to district court under section 54.02(m). The juvenile court agreed and signed transfer orders on May 8, 2019 ("the Mandatory Transfer Orders").

Appellant appealed each order. He contends the trial court (1) abused its discretion by signing the Discretionary Transfer Order because the court failed to properly apply the statutory factors for transfer, and (2) erred as a matter of law by signing the Mandatory Transfer Orders because section 54.02(m) does not apply in this case. We affirm each order.

### THE ROBBERY CASE AND THE DISCRETIONARY TRANSFER ORDER

I.      **Hearing on petition for discretionary waiver and transfer**

A.      **Armed robbery and investigation**

Two African American young men walked into La Cazuela Cocina a few days after Christmas in 2018. The first man walked into the kitchen, where he quickly took the purse of 77-year-old employee Efigenia Martinez. The second man, the shorter of the two, stopped at the cashier's counter just inside the door and pointed a small, silver handgun at 57-year-old employee Amada Martinez. The first man walked out of the kitchen; Efigenia followed quickly, carrying a large kitchen knife. By this time, the second man was behind the counter with Amada. Efigenia handed the knife to Amada, who waved it at the second man. The second man shot Amada,

then both men ran out of the restaurant. Amada survived the shooting.

Amada told the police she believed the two men who committed the robbery had been in her restaurant earlier that day and ordered burritos to go. She said one of them tried to steal a dollar from the tip bowl but put it back when confronted.

Some children told the officers they saw two African American males running from the restaurant before the police arrived to investigate. A man said he saw appellant fire a .22 caliber, silver revolver the previous day and heard him express a desire to "rob someone." That gun matched the description of the weapon fired at Amada. Officers discovered Efigenia's purse about two blocks from the restaurant and near appellant's apartment complex. One of her credit cards was missing.

The police located appellant and another juvenile, Paul (both African American), about thirty minutes after the robbery. Paul's clothes appeared identical to those worn by the first man on the video, but appellant's clothes did not match those worn by the second man on the video. The officers detained both Paul and appellant. During a consensual search, officers found Efigenia's missing credit card in Paul's pocket. Both young men were transported to a juvenile facility.

After a magistrate informed appellant of his rights, Sergeant Derek Gaspard of the Galveston Police Department interviewed appellant. Appellant denied involvement in the robbery and eventually told Sgt. Gaspard the robbery was committed by Paul and a third person, Jason. In his own interview, Paul admitted he robbed the restaurant with someone he referred to as "A.J." When shown a photo array containing both appellant's and Jason's photos, Paul identified Jason as the person who committed the robbery with him. Based on appellant's and Paul's statements, the police released appellant and detained Jason.

Appellant's mother consented to two searches of the apartment she shared

3

with appellant. In appellant's bedroom, officers found a half-eaten burrito, shoes that matched the shoes of the second man on the restaurant video, and a .22 caliber shell casing. Clothing found in appellant's apartment matched that worn by a person seen with Paul on surveillance video of the apartment complex. That clothing also matched that worn by the second man on the restaurant video.

From the clothing and the timeline, Sgt. Gaspard was able to determine it was appellant who robbed the restaurant with Paul, not Jason. Paul subsequently changed his statement, confirming appellant, not Jason, committed the robbery with him. Jason was released, and appellant was again detained for the robbery. The police searched him in conjunction with his detention and discovered he had pills containing methamphetamine in his possession. The State filed both the Robbery Case and the Drug Case. While in a juvenile detention facility for those cases, appellant allegedly spit on a guard, which resulted in the Harassment Case.

## B.    Record and history

Appellant has extensive history with the juvenile justice department (JJD). Before the robbery, appellant had been detained by the JJD 16 times in just over four years. His first detention came at age 11 for burglary of a vehicle. The other offenses for which he was detained include more burglaries, theft, criminal mischief, unlawful carrying of a weapon, and numerous violations of the terms of his probation. The State dismissed one of the charges and declined to prosecute seven others. The remaining charges were disposed of in various ways in line with JJD's 7-level progressive sanctions system, ranging from judicial probation (sanction level 3) to placement in a secure residential facility (sanction level 5).

Appellant stayed in a level 5 facility for most of 2018. He did "well," according to his probation officer. He earned a green shirt, signifying leadership among his peers. He helped staff members as well. Appellant successfully completed

4

the program and was discharged in October 2018.

A month later, he was detained for unlawful carrying of a weapon. The court adjudicated him delinquent but, at the JJD's recommendation, did not make a disposition, which means the court did not impose punishment. A month after that, appellant allegedly robbed La Cazuela Cocina.

In the three and a half months he was detained before the transfer hearing in the Robbery Case, appellant was written up at least 28 times for what the detention facility deemed "serious incidents." Examples of those incidents include: threatening to kill staff, threatening to assault and assaulting staff, threatening to assault and assaulting other juveniles, talking about shooting people, repeatedly refusing to follow instructions, disrupting the program, flooding his room, verbally abusing others, and using profanity. While visiting appellant, his probation officer heard him say, "I'm going to do my time; and when I get to the streets, I will kill all of y'all, on my mama." Appellant also reportedly said he did not care what he did or what happened to him because he had "nothing to lose."

The probation officer testified appellant is indeed the "rough and tough kid" he presents himself to be, though she never felt personally threatened by him. She recounted his outburst at a previous court appearance. During testimony about one of appellant's threats, he had exclaimed, "Bro, that's not a threat. That's a promise." The probation officer also testified appellant is "very scared." She said he does well in structured environments. Appellant's caseworker from another program has had "no problems" with him. She said he is pleasant, polite, and never disrespectful. Like the probation officer, the caseworker never felt threatened or intimidated by appellant. She testified he has "bloomed" in the theater arts and creative expression programs. In her opinion, appellant is scared of the unknown.

According to the certification report prepared by the probation officer,

appellant's overall risk to reoffend is high, as is his criminal history score. His social history score is moderate. The report does not explain the methodology used to determine those scores. The report concludes with a recommendation that appellant be transferred for adult proceedings, because the JJD had provided him "ample opportunities" and "all the necessary services" to correct his behavior but had "exhausted all efforts to help with [appellant's] rehabilitation." The caseworker, by contrast, believed appellant should continue in the JJD's sanctions system instead of being punished as an adult.

### C.    Psychological and psychiatric evaluations

Psychologist Jenine Boyd, Ph.D. evaluated appellant three times for the JJD: when he was 12, almost 14, and almost 16. Each time, he presented in a "respectful and cooperative manner." He showed no overt signs of delusions, hallucinations, or a thought disorder and denied any history of such. He had no notable medical or mental health problems. Appellant was prescribed medication for attention deficit hyperactivity disorder (ADHD) but took it only sporadically. He offered inconsistent accounts of substance abuse, originally denying ever having used drugs, then admitting to smoking marijuana, at times heavily. He said one of the marijuana cigarettes may have been, unbeknownst to him, laced with benzodiazepines.

Appellant told Boyd he had good relationships with his parents and siblings. His mother has been bedbound since appellant was seven years old. The Department of Family and Protective Services was involved earlier in appellant's life due to inadequate supervision at home and excessive school absences. He regularly skipped school and performed poorly in his classes. Boyd's report notes appellant "follows anti-social peers" and has a "negative peer group."

Boyd tested appellant to assess his intellectual functioning, academic skills, and personality. He was shown to have an IQ of roughly 85, which puts him in the

16th percentile for intelligence. He was considerably below grade-level in reading and math; his spelling skills were much better. Appellant's responses on the behavioral test were considered invalid due to inconsistency, most likely due to his rushing through the questions. Previous responses on the same test revealed his poor attitude toward school and sense of inadequacy. They also showed him to be at risk in the areas of inattention, hyperactivity, and anxiety.

Boyd's report includes these statements:

[Appellant] is not adhering to the rules and social standards in the community. His behavior and the behavior of his peers he chooses for affiliation is dangerous. He has accessed all levels of juvenile probation supervision within the community to no avail.

. . .

[Appellant] is at least similar or more mature than 15-year-old adolescents. He has been adjudicated on other juvenile delinquent charges. He was charged in 2018 with a weapons charge that is not typical of other adolescents even in the juvenile delinquent system. He does not meet the criteria for an intellectual disability or naiveté compared to other 15-year-old adolescents.

She saw "no contraindications to admission to a secure facility within the [juvenile] system."

Psychiatrist Michael Fuller, M.D. evaluated appellant about a week after Boyd's final evaluation. Fuller characterized appellant as polite, appropriate, and cooperative throughout the interview. Appellant's thought processes were "logical, coherent, and goal directed and devoid of the stigmata of persistent psychosis."

Appellant's cognitive functioning was largely unremarkable. His orientation, attention, concentration, memory, judgment, abstract reasoning, and insight were all normal. He displayed difficulty in some arithmetic tasks. Fuller said appellant has "low average innate intelligence." Still, Fuller found "no marked impairment overall

in his ability to make or use sound judgment."

Fuller concluded appellant has "probable conduct disorder," ADHD, and features of post-traumatic stress disorder due to being in a car accident at age 14 in which his friend died. However, Fuller found no symptoms of psychiatric illness. Despite admitting heavy marijuana usage to Boyd, appellant told Fuller he had smoked it only once. He also said he had ingested benzodiazepines recently.

Fuller offered several observations regarding appellant's understanding of his legal situation: Appellant adequately detailed the charges and allegations against him. He understood he could be tried as an adult and sent to prison. He showed awareness of the adversarial nature of criminal proceedings; guilty and not guilty pleas; and the roles of the judge, prosecutor, and defense attorney. Appellant knew his lawyer's name and expressed willingness to work with her and consider her advice. Fuller believed appellant could testify rationally and conduct himself appropriately at trial. In conclusion, Fuller wrote, appellant is reasonably mature and "could be certified for trial as an adult given his age and the serious nature of the criminal charges."

### D. Juvenile court's findings

The Discretionary Transfer Order is five pages long and includes the court's detailed findings regarding the offense, appellant's sophistication and maturity, his record and history, and the prospects of adequate protection of the public and the likelihood of appellant's rehabilitation through the juvenile system. The court also found probable cause to believe appellant committed the offense alleged in the Robbery Case. The findings are discussed in detail in section III.

## II. Waiver of juvenile jurisdiction

Texas juvenile courts have exclusive, original jurisdiction over cases

involving what otherwise would be criminal conduct by children 10 or older but younger than 17. Tex. Fam. Code Ann. §§ 51.02(2)(a), 51.03(a)(1), 51.04(a). If a juvenile court determines after an evidentiary hearing that certain requirements are satisfied, it may waive its jurisdiction and transfer a child to the district court for criminal proceedings. *Id.* § 54.02(a), (c). Transfer of a juvenile for prosecution as an adult "should be regarded as the exception, not the rule." *Moon v. State*, 451 S.W.3d 28, 36 (Tex. Crim. App. 2014). Transfer proceedings are "critically important," and any statutory mechanism for waiving juvenile-court jurisdiction must at least "measure up to the essentials of due process and fair treatment." *Id.* (quoting *Kent v. United States*, 383 U.S. 541, 560–62 (1966)).

The State bears the burden to persuade the juvenile court by a preponderance of the evidence that "the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both)." *Moon*, at 40–41; *accord Taylor v. State*, 553 S.W.3d 94, 98 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (op. on reh'g). The statutory requirements for waiver of jurisdiction and transfer are:

(1)    the child is alleged to have [committed a] felony;

(2)    the child was:

(A)    14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or

(B)    15 years of age or older at the time the child is alleged to have committed the offense, if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; and

9

(3)     after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a).

In making this determination, the juvenile court must consider, among other matters, the following factors:

(1)     whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2)     the sophistication and maturity of the child;

(3)     the record and previous history of the child; and

(4)     the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f). Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer. *Moon*, 451 S.W.3d at 47 & n.78. "The trial court is bound only to consider these . . . factors in deciding whether to waive jurisdiction. The court need not find that each factor is established by the evidence." *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (quoting *In re D.L.N.*, 930 S.W.2d 253, 258 (Tex. App.—Houston [14th Dist.] 1996, no writ)).

If the juvenile court waives its jurisdiction, it is required to "state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court . . . ." Tex. Fam. Code Ann. § 54.02(h). Section 54.02(h) requires the juvenile court to include its reasons for waiver and specific findings of

fact that undergird those reasons in its transfer order. In other words, the *Moon* court wrote, "the court should take pains to 'show its work,' as it were, by spreading its deliberative process on the record. . . ." *Moon*, 451 S.W.3d at 49.

Our review of a transfer order is two-pronged. First, we review the specific findings of fact concerning the section 54.02(f) factors under a "traditional sufficiency of the evidence review." *Id.* at 47. Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *C.M.M.*, 503 S.W.3d at 701. If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id.* Under a factual sufficiency challenge, we consider all the evidence presented to determine if the court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.*

Second, we review the waiver decision for an abuse of discretion. *Moon*, 451 S.W.3d at 47. That is, in reviewing the juvenile court's conclusion that the seriousness of the offense alleged and/or the background of the juvenile calls for criminal proceedings for the welfare of the community, we ask, in light of our own analysis of the sufficiency of the evidence to support the section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. *Id.* A juvenile court abuses its discretion when its decision to transfer is essentially arbitrary, given the evidence upon which it was based. *Id.* By contrast, a waiver decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.* at 49. "[A] juvenile court that shows its work should rarely be reversed." *Id.*

## III. Application

We begin with what is not in dispute. Appellant is alleged to have committed

a third-degree felony when he was 15 years old, and he does not dispute the juvenile court's finding of probable cause to believe he committed that offense. Section 54.02(a)(1), (a)(2), and the probable-cause part of (a)(3) are satisfied.

Appellant's challenge concerns the remainder of subsection (a)(3): the court's finding that due to the seriousness of the offense alleged or the background of the child, the welfare of the community requires criminal proceedings. He alleges the court failed to properly apply the section 54.02(f) factors in making that finding.

## A.    54.02(f) factors

### 1.    Seriousness of the offense

Appellant concedes the alleged offense was against a person. The juvenile judge noted several aspects of the offense she found "particularly egregious and aggravating":

- After appellant bought food from the restaurant, he went home and changed his clothes before returning to rob the restaurant.

- According to Paul, appellant suggested robbing the restaurant and said he planned to fire a gun.

- Appellant shot 57-year-old Amada, and the bullet lodged in her breast.

- Appellant and Paul fled the scene and went home so appellant could change clothes again.

- Appellant gave the police false information, which led them to release him and detain Jason for the robbery.

- Appellant possessed methamphetamine when he was detained for the robbery.

Appellant does not challenge any of these findings.

### 2.    Sophistication and maturity

The judge relied heavily on both Boyd's and Fuller's reports. She endorsed

12

Boyd's observations that appellant was equally or more mature than other 15-year-old adolescents and did not meet the criteria for an intellectual disability or naiveté compared with his peers. The judge also quoted Boyd's statement that appellant's alleged unlawful possession of a weapon in November 2018 was atypical for other adolescents, "even in the juvenile delinquent system." From Fuller's report, the judge cited appellant's average intelligence and his normal cognitive functioning, in particular his logical, coherent, and goal-directed thought processes. She recognized appellant displayed symptoms of ADHD and PTSD but noted he did not display symptoms of psychiatric illness. The judge also relied on Fuller's assessment that appellant was fit to proceed for trial and could be certified as an adult due to his age and the serious nature of the offense.

As evidence of his unsophistication and immaturity, appellant points to his 16th-percentile, below-average intelligence and his "trouble processing information." Fuller's report describes appellant's intelligence as both "average" and "low average," but the court's findings do not mention "low average." We cannot say that the trial court's use of "average" instead of "low average" undermines her findings regarding appellant's sophistication and maturity, particularly in light of the other evidence she cited. Appellant also asserts the trial court's findings "ignore[] major psychological issues that severely impact a person's ability to evaluate and process information." We disagree. There is no evidence that appellant's "psychological issues," major or not, impact his ability to evaluate and process information. The court acknowledged both appellant's diminished intelligence and Boyd's opinion that it did not meet the criteria for an intellectual disability. Similarly, the court recognized appellant's ADHD and history of nightmares while also recognizing Fuller's opinion that appellant lacked symptoms of psychiatric illness.

### 3. Record and history

The court cited appellant's long history of delinquency, noting in particular five burglaries of vehicles, one burglary of a habitation, one burglary of a building, evading arrest or detention, and unlawful carrying of a weapon, as well as the alleged offenses in the Subsequent Cases. In addition, the court found, appellant pleaded true to numerous probation violations. Appellant's admitted use of illegal substances is also noted in the court's findings.

Appellant contends some of his previous detentions were "due to the fact that no parent or guardian was present to whom the court could release [him]." He cites no evidence to support that contention, and none appears in the record. He also minimizes the 11 offenses listed in the court's findings, noting only two were for felonies (burglary of a habitation is a second-degree felony; of a building, a state jail felony). The rest, he says, concerned misdemeanors, resulted in dismissal, or have not been adjudicated. One charge—evading arrest or detention—was voluntarily dismissed by the State because appellant was going to be punished for the offenses he committed for which he was evading arrest. Nothing in the record suggests that charge lacked merit. Two of the listed offenses are those at issue in the Subsequent Cases, and appellant is correct that he has not been adjudicated or otherwise found to have committed those offenses. But he does not dispute that he committed seven burglaries in less than three and a half years, even if five of them were "just" Class A misdemeanors. Nor does he dispute the weapon charge, which also happens to be a Class A misdemeanor.

### 4. Prospects for rehabilitation

The judge noted that 16-year-old appellant would have less than three years in the juvenile system, because its maximum age for services is 19. She referred to the multiple services already offered to appellant to no avail, including placements

in two residential facilities. Appellant threatened to murder someone, the judge wrote, and his risk to reoffend is high. For those reasons, the court found "little, if any" likelihood that the facilities and services available in the juvenile system could reasonably be expected to rehabilitate appellant. The low prospect of rehabilitation, coupled with the seriousness of the offense and appellant's background, led her to find that the welfare of the community requires criminal proceedings.

Appellant faults the trial court for ignoring Boyd's statement that "there are no contraindications to admission to a secure facility within the [juvenile] system" and for not explaining why sanction level 6 in the juvenile system would be inadequate to address both the public's and appellant's needs. We agree that the court did not quote Boyd's statement, but we disagree that she ignored it. Sanction level 6 means confinement in a JJD facility. *See* Tex. Fam. Code Ann. § 59.009(a). That level does not appear to allow for a longer sentence than the amount of time the child can remain in the juvenile system. *See id.* § 59.009(c). Boyd stated, and the trial court cited her statement, that appellant would have less than three years in the juvenile system. The certification report stated the JJD had provided ample opportunities and services to appellant but had "exhausted all efforts" to rehabilitate appellant adequately. The probation officer testified that she believed appellant should be transferred for adult proceedings.

Appellant also complains that no evidence or argument was presented as to why a determinate sentence would not be sufficient. Certain offenses, including aggravated robbery, are eligible for referral to the grand jury for approval of prosecution. Tex. Fam. Code Ann. § 53.035. If the grand jury approves the prosecution and the child is adjudicated delinquent for that offense, the child faces a "determinate sentence" of up to 10, 20, or 40 years, depending on the nature of the offense. *Id.* § 54.04(d)(3). The decision whether to seek a determinate sentence lies

15

with the prosecutor, not the court. *Id.* § 53.035(a) ("The prosecuting attorney may, before filing a petition [for adjudication as delinquent] under Section 53.04, refer an offense to a grand jury in the county in which the offense is alleged to have been committed."). Appellant offers no authority to suggest the juvenile court must explain why a determinate sentence would be inadequate when the prosecutor has not elected to seek a determinate sentence.

## B.  Evidentiary sufficiency

Our task is to determine whether the evidence laid out above is legally and factually sufficient to support the juvenile court's finding in the Discretionary Transfer Order that due to the seriousness of the offense alleged or the background of the child, the welfare of the community requires criminal proceedings. *Moon*, 451 S.W.3d at 49. To determine legal sufficiency, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *C.M.M.*, 503 S.W.3d at 701. If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id.* Under a factual sufficiency challenge, we consider all the evidence presented to determine if the court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.*

Here, ample evidence supports the court's finding that the welfare of the community requires criminal proceedings. The judge identified certain aspects of the offense she found "particularly egregious and aggravating," including appellant's use of a firearm and his false statements to police that led to the wrongful detention of Jason. Following evaluation by two mental health professionals, appellant was found to have normal cognitive functioning, logical and coherent thought processes, and the ability to make and use sound judgment. He displayed no symptoms of any psychiatric illness. Appellant's juvenile record is extensive and

16

unabating. He committed at least eight offenses in less than three and a half years and admitted to multiple probation violations. His probation officer believed the JJD had done all it can do for appellant. Though his caseworker disagreed and Boyd stated there are no contraindications to placement in a secure JJD facility, we cannot say that the trial court's finding is against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. We conclude the juvenile court's finding is supported by legally and factually sufficient evidence.

## C.    No abuse of discretion

Next, we review the waiver decision for an abuse of discretion. *Moon*, 451 S.W.3d at 47. We ask, in light of our own analysis of the sufficiency of the evidence, whether the juvenile court acted without reference to guiding rules or principles. *See id.* A juvenile court abuses its discretion when its decision to transfer is essentially arbitrary. *See id.*

At the end of the transfer hearing, the juvenile judge expressed her need for more time to review the files as she made her decision:

> I'm going to do something that I — I don't like to do. I'm going to —
> I'm going to take 24 hours and I'm going to read these. . . . I'm going
> to keep these files. I want to go over them and read a couple more things
> in a little more detail. This is a very difficult decision to make and I
> don't want to make it lightly.

In fact, the court waited five days before reconvening the parties to deliver her decision. Before she announced her ruling, she addressed appellant directly:

> Mr. [F.], this right here (indicating) — this is what I spent my time
> reviewing, and I want you to know that the decision I reached in . . .
> this case was a very difficult one; and I really agonized and struggled
> over this decision.
>
> I did hear your attorney say that you did very well whenever you had a
> structured environment. I heard that very clearly. What I could not get

17

past was your criminal history and the fact that the criminal history appeared to be escalating. It appears to be getting more serious with time.

The juvenile court "showed its work" in the Discretionary Transfer Order, and the waiver decision represents "a reasonably principled application of the legislative criteria." *Moon*, 451 S.W.3d at 49. The court's decision to transfer was not "essentially arbitrary," nor was it make "without reference to guiding rules or principles." *Id.* at 47. We conclude the juvenile court did not abuse its discretion in signing the Discretionary Transfer Order.

## D.     Conclusion

We overrule appellant's sole issue and affirm the Discretionary Transfer Order.

### THE SUBSEQUENT CASES AND THE MANDATORY TRANSFER ORDERS

Section 54.02(m) is Texas' codification of the "once an adult, always an adult" doctrine of juvenile certification law. As relevant here, section 54.02(m) mandates a juvenile court to waive jurisdiction and transfer a child to the appropriate adult court if the child has "previously been transferred." The question we must answer is one of first impression: must the "previous transfer" precede only the section 54.02(m) transfer, or must it also precede the conduct at issue in the section 54.02(m) transfer?

The answer to the question depends on the relative chronology of three events: the child's first delinquent act, the juvenile court's waiver of jurisdiction and transfer to adult court regarding the child's first delinquent act, and the child's second delinquent act. Appellant contends section 54.02(m) applies only if the first transfer precedes—is previous to—the second delinquent act. The State contends section 54.02(m) makes no such requirement, and that the first transfer need precede only the 54.02(m) transfer, regardless of when the conduct at issue in the 54.02(m)

18

transfer occurred.

The relevant time in this case is as follows:

| | |
|---|---|
| December 28, 2018 | Appellant allegedly robbed restaurant |
| January 11, 2019 | Appellant allegedly possessed methamphetamine |
| January 14, 2019 | Robbery Case filed |
| January 14, 2019 | Drug Case filed |
| February 21, 2019 | Appellant allegedly spit on detention facility guard |
| February 28, 2019 | Harassment Case filed |
| March 19, 2019 | Petition for discretionary transfer filed in Robbery Case |
| May 6, 2019 3:05 pm | Discretionary Transfer Order signed |
| May 6, 2019 4:30 pm | Petitions for mandatory transfer filed in Subsequent Cases |
| May 8, 2019 | Mandatory Transfer Orders signed |

## IV.    Legal standards

### A.    Statutory construction

We review issues of statutory construction de novo. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). Our primary objective in construing a statute is to give effect to the Legislature's intent. *Id.* We ascertain intent from the plain meaning of the words used in the statute, because "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012). We may not "judicially amend a statute by adding words not contained in the language of the statute." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam). Rather, a court must apply the statute as written. *Id.* We presume the Legislature selected statutory words, phrases, and

expressions deliberately and purposefully, "accepting that lawmaker-authors chose their words carefully, both in what they included and in what they excluded." *Sommers v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017). We do not consider those words and phrases in isolation; rather, "we consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage." *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016).

## B.    "Once an adult, always an adult" laws in other states

Many states have some version of the "once an adult, always an adult" doctrine. Most explicitly apply only to transfers regarding conduct committed by the juvenile after the first transfer. Those statutes generally provide that once a juvenile is transferred for adult proceedings or, in some cases, convicted as an adult, the court must also transfer him with respect to any delinquent act he is alleged to have committed after the first transfer (or conviction). Two events are required: the first transfer (or conviction), and a delinquent act after that transfer (or conviction). For example, in the District of Columbia, "[t]ransfer of a child for criminal prosecution terminates the jurisdiction of the [Family] Division over the child with respect to **any subsequent delinquent act** . . . ." D.C. Code § 16-2307(h) (boldface added). Alabama follows that concept but enlarges the scope of conduct covered; its transfer statute applies to both future acts and pending allegations of delinquency. Ala. Code § 12-15-203(i) ("A conviction . . . of a child of a criminal offense . . . shall terminate the jurisdiction of the juvenile court over that child with respect to **any future delinquent acts** and with respect to **any pending allegations of delinquency** which have not been disposed of by the juvenile court . . . .") (boldface added).[4]

---

[4] Other states with statutes that limit their application to acts committed after a certain point in time include **Florida** ("Once a child has been transferred for criminal prosecution pursuant to an information and has been found to have committed the presenting offense or a lesser included offense, the child shall be handled thereafter in every respect as if an adult for any subsequent

Other transfer statutes do not mention the child's conduct. Instead, the only required event is the first transfer (or conviction). The Michigan statute states, "[T]he [juvenile] court shall waive jurisdiction of the juvenile if the court finds that the juvenile has previously been subject to the jurisdiction of the circuit court under this section . . . ." Mich. Comp. Laws § 712A.4(5). In Indiana, the juvenile court shall waive jurisdiction over a child upon motion by the prosecutor if, among other things, "the child has previously been convicted of a felony or nontraffic misdemeanor." Ind. Code § 31-30-3-6(2).[5] An Indiana appellate court construed that statute in *State*

---

violation of state law . . . ." Fla. Stat. § 985.557(2)(a)); **Idaho** ("[O]nce a juvenile offender has been found to have committed the offense for which the juvenile offender was charged, indicted or transferred pursuant to this section . . . , the juvenile offender shall thereafter be handled in every respect as an adult. For any subsequent violation of Idaho law, the juvenile offender shall be handled in every respect as an adult." Idaho Code § 20-509(3)); **Iowa** ("Once a child sixteen years of age or older has been waived by the juvenile court to the district court, all subsequent criminal proceedings against the child for any delinquent act committed after the date of the waiver by the juvenile court shall begin in district court . . . ." Iowa Code § 232.45A(2)); **North Dakota** ("Any transfer operates to terminate the juvenile court's jurisdiction over the child with respect to any future offense . . . ." N.D. Cent. Code § 27-20-34(4)); **Rhode Island** ("A waiver of jurisdiction over a child pursuant to this section shall constitute a waiver of jurisdiction over that child for the offense upon which the motion is based as well as for all pending and subsequent offenses of whatever nature . . . ." R.I. Gen. Laws § 14-1-7.1(c)); **Utah** ("When a minor has been certified to the district court under this section, . . . the jurisdiction of the juvenile court over the minor is terminated regarding that offense, any other offenses arising from the same criminal episode, and any subsequent misdemeanors or felonies charged against the minor . . . ." Utah Code Ann. § 78A-6-703(19)); and **Virginia** ("Conviction of a juvenile as an adult pursuant to the [certification] provisions of this chapter shall preclude the juvenile court from taking jurisdiction of such juvenile for subsequent offenses committed by that juvenile." Va. Code Ann. § 16.1-271).

[5] Other states with transfer statutes that do not depend on the timing of juvenile's acts include **Maryland** ("If the court has once waived its jurisdiction with respect to a child in accordance with this section, and that child is subsequently brought before the court on another charge of delinquency, the court may waive its jurisdiction in the subsequent proceeding after summary review." Md. Code Ann., Cts. & Jud. Proc., § 3-8A-06(h)); **Minnesota** ("[T]he court shall order a certification in any felony case if the prosecutor shows that the child has previously been prosecuted on a felony charge by an order of certification . . . ." Minn. Stat. § 260B.125(5)); **Nevada** ("Any minor who has been tried and convicted as an adult shall henceforth be treated as an adult for all purposes in connection with any criminal offense with which said minor may be charged." N.H. Rev. Stat. § 169-B:27); and **Wisconsin** (Criminal courts have exclusive jurisdiction over "[a] juvenile who is alleged to have violated any state criminal law if the juvenile has been convicted of a previous violation following waiver of jurisdiction" by the juvenile court. Wis. Stat. § 938.183(1)(b)).

21

*v. C.K.*, 70 N.E.2d 900 (Ind. Ct. App. 2017). C.K. asserted the only conviction that invoked the transfer statute was one was imposed before the juvenile committed the act that led to the filing of the delinquency petition. *Id.* at 903. The State contended the statute was satisfied by any conviction imposed before the motion to transfer was filed. *Id.* The court of appeals agreed with the State, writing, "The plain language of the statute does not place any limits on when the prior . . . conviction must have occurred. [It was sufficient that] C.K.'s felony conviction was imposed before the State filed its motion for waiver of juvenile court jurisdiction." *Id.*

## V.  Application

Texas' mandatory transfer statute states:

(m)  Not withstanding any other provision of this section, the juvenile court shall waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal court for criminal proceedings if:

> (1)  the child has previously been transferred to a district court or criminal district court for criminal proceedings under this section, unless:
>
>> (A)  the child was not indicted in the matter transferred by the grand jury;
>>
>> (B)  the child was found not guilty in the matter transferred:
>>
>> (C)  the matter transferred was dismissed with prejudice; or
>>
>> (D)  the child was convicted in the matter transferred, the conviction was reversed on appeal, and the appeal is final; and
>
> (2)  the child is alleged to have violated a penal law of the grade of felony.

Tex. Fam. Code Ann. § 54.02(m).[6]

Appellant asserts, "[T]he relevant time frame for 'previous' is the date the separate offense [the offense at issue in the request for mandatory transfer] is alleged to have been committed." He cites *In re J.W.W.*, 507 S.W.3d 408 (Tex. App.—Houston [1st Dist.] 2016, no pet), a case in which the first transfer happened to occur before the delinquent acts that were the subject of the 54.02(m) motion to transfer, though nothing in the opinion suggests section 54.02(m) requires such a chronology. *See id.* at 415–16. Appellant effectively suggests section 54.02(m)(1) falls into the first category of transfer statutes discussed above—those that explicitly require the first transfer to precede the delinquent acts in question.

But section 54.02(m)(1) falls into the second category of transfer statutes, not the first. It does not mention the child's conduct. The only requirement is that child has previously been transferred for criminal proceedings. Just as in *C.K.*, appellant's position could not be correct unless we were to "judicially amend [section 54.02(m)(1)] by adding words not contained in the language of the statute." *Lippincott*, 462 S.W.3d at 508.

Appellant relies on a statement in a learned treatise on juvenile justice regarding the Legislature's intent for section 54.02(m)(1):

> Although the statutory language [of section 54.02(m)(1)] is somewhat unclear, the legislature's intent is that the transfer order must have been made by the juvenile court before the new felony was committed by the child.

ROBERT O. DAWSON, TEXAS JUVENILE LAW 199–200 (Tex. Juvenile Justice Dep't ed., 9th ed. 2018). No support is offered for this assertion.

---

[6] Appellant's sole argument concerns the meaning of "previously been transferred." He does not suggest any of the four exceptions apply, nor does he dispute that the offenses at issue in the Subsequent Cases are felonies.

Binding precedent requires us to ascertain intent from the plain meaning of the words used in the statute, because "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A&M*, 381 S.W.3d at 507. Many mandatory transfer statutes across the country explicitly apply only to "subsequent delinquent acts"—acts committed after the first transfer. Section 54.02(m)(1) does not. "The wisdom or expediency of the law is the Legislature's prerogative, not ours." *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968); *accord City of Laredo v. Laredo Merchants Ass'n*, 550 S.W.3d 586, 589–90 (Tex. 2018). "We are not empowered to substitute what we believe is right or fair for what the Legislature has written, even if the statute seems unwise or unfair." *Vandyke v. State*, 538 S.W.3d 561, 569 (Tex. Crim. App. 2017).

Appellant urges us to characterize section 54.02(m) as being akin to an ex post facto law as it was applied to him. Ex post facto laws are prohibited by the U.S. and Texas Constitutions. U.S. Const. art. 1, § 10; Tex. Const. art. 1, § 16. An ex post facto law is one that (1) criminalizes an act previously committed that was innocent when done; (2) aggravates a crime, or makes it greater than it was when committed; (3) inflicts greater punishment than the law attached to the criminal offense when committed; or (4) deprives a person charged with a crime to any defense available at the time the act was committed. *See Peugh v. United States*, 569 U.S. 530, 538 (2013); *Rodriguez v. State*, 93 S.W.3d 60, 66 (Tex. Crim. App. 2002). Appellant points out that the relevant point in time in an ex post facto analysis is the time the offense was committed, because that is the time that defines the offender's rights.

We need not decide as a general matter whether section 54.02(m) functions as an ex post facto law, because it does not so function in this case. The offenses alleged in the Subsequent Cases are third-degree felonies,[7] and appellant was 15 years old

---

[7] See Tex. Health & Safety Code Ann. §§ 481.102(6) (methamphetamine is controlled substance

when he allegedly committed each offense. As a result, the juvenile court could have transferred appellant under section 54.02(a), the discretionary transfer statute. *See* Tex. Fam. Code Ann. § 54.02(a)(2)(B) (permitting transfer for third-degree felony if child was 15 years of age or older at time of offense). At the time of the alleged offenses, appellant was subject to being treated as an adult charged with third-degree felonies, so there is no ex post facto violation. The vehicle used to effect his transfer to district court does not change that fact.

Finally, appellant contends that this construction of section 54.02(m)(1) would lead to absurd results. First, he says, section 54.02(g) would be rendered meaningless. Subsection (g) states:

> (g) If the petition alleges multiple offenses that constitute more than one criminal transaction, the juvenile court shall either retain or transfer all offenses relating to a single transaction. Except as provided by Subsection (g-1), a child is not subject to criminal prosecution at any time for any offense arising out of a criminal transaction for which the juvenile court retains jurisdiction.

Tex. Fam. Code Ann. § 54.02(g). Appellant argues that by waiting to seek to transfer the Subsequent Cases, the State has wrested away the trial court's discretion to transfer some but not all of his cases. We disagree under the facts of this case. The State did not file a "petition [that] alleges multiple offenses." It filed three petitions, each alleging one offense. Appellant does not suggest that the alleged robbery, possession, and spitting on the guard constituted a single criminal transaction or that those offenses should have been charged in one petition.

Second, he hypothesizes that previously untransferable juveniles would become transferable due solely to section 54.02(m). He conjures a 13-year-old child

---

in Penalty Group 1); 481.115(c) (possession of one to four grams of controlled substance in Penalty Group 1 is third-degree felony); Tex. Penal Code Ann. § 22.11(b) (harassment of public servant is third-degree felony).

charged with an offense that would be a felony if committed by an adult. A child of that age may not be transferred under the discretionary transfer statute, section 54.02(a). But, if that child is discretionarily transferred at age 15 for another offense, appellant supposes, the State could subsequently seek mandatory transfer for the offense he committed at age 13, and the court would have no choice but to grant the request.

Appellant is effectively asserting the statute would be unconstitutional as applied to the hypothetical 13-year-old juvenile. An as-applied challenge concedes a statute is generally constitutional but claims it operates unconstitutionally as to the challenger because of his circumstances. *Johnson v. State*, 562 S.W.3d 168, 175 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (op. on reh'g). We must evaluate the statute as it has been applied against the challenger. *See State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). We do not entertain hypothetical claims or consider the potential impact of the statute on anyone other than the challenger. *Lykos*, 330 S.W.3d at 910. Appellant's hypothetical situation is not presented in this case, and therefore we do not consider it.

We overrule appellant's sole issue and affirm each the Mandatory Transfer Orders.

/s/ Ken Wise
   Justice

Panel consists of  Justices Wise, Jewell, and Hassan.